1                IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF WYOMING

3    ----------------------------------------------------------------

4    UNITED STATES OF AMERICA,            Case No. 12-CR-00245-J

5            Plaintiff,                    Volume II **EXCERPT**
                                          Cheyenne, Wyoming
6            vs.                           July 29, 2014
                                          9:09 a.m.
7    MARVIN IVERSON,

8            Defendant.                    **CERTIFIED COPY**

9    ----------------------------------------------------------------

10

11                 TRANSCRIPT OF TRIAL PROCEEDINGS

12                 **(TESTIMONY OF PAUL CARDWELL)**

13            BEFORE THE HONORABLE ALAN B. JOHNSON
                  UNITED STATES DISTRICT JUDGE
14           and a jury of twelve and two alternates

15
     APPEARANCES:
16
     For the Plaintiff:       MS. STEPHANIE I. SPRECHER
17                            Assistant United States Attorney
                              UNITED STATES ATTORNEY'S OFFICE
18                            P.O. Box 22211
                              Casper, WY 82602
19
     For the Defendant:       MR. MARVIN IVERSON, Pro Se
20                            MR. JAMES H. BARRETT, Standby Counsel
                              Assistant Federal Public Defender
21                            OFFICE OF THE FEDERAL PUBLIC DEFENDER
                              214 West Lincolnway
22                            Suite 31-A
                              Cheyenne, WY 82001
23
     Court Reporter:          MS. JULIE H. THOMAS, RMR, CRR
24                            2120 Capitol Avenue, Room 2228
                              Cheyenne, WY 82001
25                            (307)778-0078   CA CSR No. 9162

     Proceedings recorded by mechanical stenography,
     transcript produced by computer.

1                         I N D E X

2

PLAINTIFF'S WITNESS                                        PAGE

3

PAUL CARDWELL
4     Direct - Ms. Sprecher                                3
      Cross - Mr. Iverson                                 15

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings resumed 9:09 a.m.,

2       July 29, 2014.)

3                       *     *     *     *     *

4           MS. SPRECHER:  The Government calls Paul Cardwell,

5   Your Honor.

6           THE COURT:  Please raise your right hand and be

7   sworn.

8       (The witness was sworn.)

9           COURTROOM DEPUTY:  Please be seated.

10          THE WITNESS:  Thank you.

11          COURTROOM DEPUTY:  Please state your name and spell

12  it for the record.

13          THE WITNESS:  Paul Cardwell, P-a-u-l,

14  C-a-r-d-w-e-l-l.

15     PAUL CARDWELL, PLAINTIFF'S WITNESS, DIRECT EXAMINATION

16  BY MS. SPRECHER:

17  Q.  Good morning, Mr. Cardwell.

18  A.  Good morning.

19  Q.  Are you here as a result of a subpoena that the Government

20  served on you?

21  A.  Yes, I am.

22  Q.  And are you currently incarcerated?

23  A.  I am, yes.

24  Q.  And have you been incarcerated for very long?

25  A.  Uh, for 14 months.

1   Q.  All right.  And is that as the result of a conviction for

2   charges not related to anything with Mr. Iverson?

3   A.  That's correct.

4   Q.  What were the charges that you were convicted of?

5   A.  I was convicted of money laundering.

6   Q.  All right.  And were there three counts that you pled

7   guilty to?

8   A.  That's correct, money laundering and mail fraud.

9   Q.  Was that as the result of a plea agreement?

10  A.  Yes, it was.

11  Q.  And did it also encompass two districts, that being

12  Wyoming and Indiana?

13  A.  Yes.

14  Q.  Did your plea agreement include that you would cooperate

15  with the Government?

16  A.  Yes, it did.

17  Q.  And did it also include that for your cooperation if the

18  Government decided that you were helpful or provided

19  substantial assistance that they would recommend a sentence

20  reduction for you?

21  A.  Yes, that was a possibility.

22  Q.  All right.  Was that a guarantee?

23  A.  No, it was not.

24  Q.  And do you know ultimately, even if the Government makes a

25  recommendation for a sentence recommendation, who decides

1  that?

2  A.  The judge.

3  Q.  All right.  Were you also informed that if you were to

4  testify in any case that the outcome of the case did not

5  matter in regard to whether or not we would make a

6  recommendation?

7  A.  Yes, the outcome does not matter.

8  Q.  In the plea agreement that you had, you pled guilty to the

9  three counts that you talked about.  Were there also counts

10  dismissed?

11  A.  Yes, there were.

12  Q.  And were there how many counts dismissed?

13  A.  I believe 14 counts were dismissed.

14  Q.  And did they also include counts of mail fraud?

15  A.  Yes, they did.

16  Q.  Did you agree to talk with the Government in the form of a

17  proffer letter?

18  A.  I did, yes.

19  Q.  And a proffer is where you proffer information to the

20  Government about information you have regarding crimes that

21  you committed and other crimes you might know about; is that

22  right?

23  A.  Yes, it is.

24  Q.  As part of the proffer agreement, do you have any

25  obligation in regard to the information that you give us?

1    A.  Just that it must be truthful.

2    Q.  All right.  If the Government were to find out that the

3    information was unreliable or untruthful, do you know what

4    would happen to the Government's obligation to make a sentence

5    recommendation?

6    A.  Uh, that would be removed.

7    Q.  The judgment and sentence against you, how many months did

8    you receive on the counts that you pled guilty to?

9    A.  120 months.

10   Q.  And do you have supervised release to follow?

11   A.  Yes, I do, for three years.

12   Q.  And that's currently the time that you are serving now?

13   A.  That's correct.

14   Q.  All right.  Other than the counts that you have been

15   convicted of that you just talked about, do you have any prior

16   criminal record?

17   A.  No, I do not.

18   Q.  Can you tell the ladies and gentlemen of the jury what you

19   did before you became incarcerated?

20   A.  I was a president and chief executive officer of a

21   hospital.

22   Q.  And was it in that position that you broke the law and

23   ended up here?

24   A.  That is correct.

25   Q.  What is your educational background?

1    A.  Uh, primarily a bachelor and master's work and Ph.D. work

2    at Indiana University, Indiana Wesleyan University, and the

3    University of Notre Dame.

4    Q.  And your employment history?

5    A.  Uh, primarily I worked as -- for, for 10 years as a chief

6    executive officer of Indiana University hospital system in

7    Monticello, Indiana, and most recently as the president and

8    CEO of Powell Valley Healthcare in Powell, Wyoming.  Prior to

9    that, additional stints in hospital and nursing home

10   administration.

11   Q.  As part of your being incarcerated, did you meet

12   Mr. Marvin Iverson?

13   A.  I did, yes.

14   Q.  Can you describe how it is you met him?

15   A.  We were in the same, uh, pod, as it's called, at Scotts

16   Bluff County facility in Scotts Bluff, Nebraska.

17   Q.  What is a pod?

18   A.  A pod is a large setting that houses somewhere between, I

19   would say, 20 and 30 inmates.

20   Q.  And so did those inmates have an opportunity to interact?

21   A.  Yes, they do.  We're locked, uh, down, at Scotts Bluff in

22   particular, locked down in the evening, but during the day the

23   cell doors are open, and we have a day room, a common area

24   where we watch television and such.

25   Q.  All right.  While you were in the same pod with

1   Mr. Iverson did you get acquainted with him?

2   A.   I did, yes.

3   Q.   All right.  And how would you describe your acquaintance?

4   A.   Uh, a very nice gentleman.  He had the opportunity to

5   speak on several different occasions.  He took the time and

6   took the inclination to talk about his LDS faith and the

7   Mormon faith, gave me a Mormon bible, and just had several

8   opportunities just to talk about my past and his past and why

9   we were basically in jail at the same time.

10  Q.   At some point did you become more than podmates?

11  A.   Yes.  Several weeks into the stay they had an opening

12  downstairs, it was a two-level pod, and the chief -- the

13  correctional officers asked if I would be willing to move down

14  and share a room, a cell, with Mr. Iverson.

15  Q.   When was it that you met Mr. Iverson?

16  A.   I would say it was about Christmastime of last year.

17  Q.   And when was it that you roomed with him?

18  A.   Um, in January of, of 2014.

19  Q.   Did you continue to talk about why you were each there?

20  A.   Yes, we did.

21  Q.   And did he mention to you what it was that landed him

22  there?

23  A.   He did, yes.

24  Q.   Okay.  What did he tell you?

25  A.   Basically he described a situation where he had been

1   accused of bank fraud.

2   Q.  All right.  Did he describe to you any actions that he

3   took to have those charges levied against him?

4   A.  He did, yes, ma'am.

5   Q.  What did he explain to you?

6   A.  Basically he said that he had joined a group called the

7   Patriot Group, and he had received training both in Las Vegas,

8   Nevada, and additionally in California to manipulate a system

9   with a, with a scheme called an EFT by which he would open and

10  close a checking account and then write checks, um, to

11  institutions on that closed account in the hopes of having the

12  lending institutions or the banks cash those checks and

13  dismiss those debts.

14  Q.  All right.  You said -- you called it a scheme.  Can you

15  describe what it was that Mr. Iverson told you he was doing?

16  A.  Basically he would write a check in a number of different

17  occasions, I think three or four different situations, to pay

18  off a debt that he had.  And his feeling was or the training

19  that he had received was basically that he would start off

20  small with smaller check amounts, and he would write something

21  specific on the check that he thought would stop him from

22  being able to get in trouble, specifically, um, For Deposit

23  Only, EFT, No Recourse, that he would write on this check.  He

24  mentioned that he had started it initially to pay off a debt

25  on an ice business in Wyoming.  Secondly, he paid off an

1   automobile loan.  Both of those were successful in that they

2   cashed the checks and paid off the loans.  He then used a

3   larger amount, somewhere around $40,000 or so, to pay off a

4   Dodge truck, a pickup truck, and then ultimately, with those

5   being successful, wrote a large check, 370-some-odd-thousand

6   dollars, to JPMorgan Chase to pay off his daughter's home in,

7   in Wyoming.

8   Q.  All right.  The word you used, "scheme," was that

9   Mr. Iverson's word?

10  A.  His word, not mine, yes, ma'am.

11  Q.  All right.  And did he give you any reason about why he

12  would do this to the banks?

13  A.  He was -- there was some anger with the United States

14  Government that he had expressed and particularly leveled just

15  against the judicial system and the banking system.  Basically

16  felt that the banks had received funds during a bailout period

17  over a number of years, and he had personally known

18  individuals that had been foreclosed by those banks, and he

19  just felt with the government handout to those lending

20  institutions that there was a debt owed, you know, to your

21  average person.  And he had learned in his training from

22  different individuals and in Las Vegas that this was a means

23  by which, um, he could take advantage of the banking industry

24  and use these EFT checks and discharge his debt.

25  Q.  All right.  Did he talk to you about, I guess, the lack of

1   success that he had and how he ended up in, in prison?

2   A.  Uh, yes, he did mention that I think in the final, um, the

3   $370,000 amount that that was not successful and that they

4   were charging him with bank fraud for basically those four

5   different accounts and then a credit card account where he had

6   run up debt with the intent to use an EFT bank on a closed

7   account to pay off that debt on a credit card.

8   Q.  Did he talk to you about what he'd done with some of the

9   property?

10  A.  He did, yes.

11  Q.  What did he talk to you about?

12  A.  Just where he had placed the property or specifically

13  where he had hidden the property, the assets, on -- describe

14  that, ma'am?

15  Q.  Yes, please.

16  A.  Okay.  Basically he just said where he had hidden the

17  pickup truck when he had elected to flee from authorities and

18  hide.  He found an individual that was willing to allow him to

19  hide the $40,000 pickup truck on, on a farm, and described

20  how -- where it was hidden under, under a green tarp in a

21  specific hill area amongst a group of pine trees and very

22  specific details on, on where that was hidden.

23  Q.  You mentioned that when he was running -- he was talking

24  to you about the running.  What did he tell you about that?

25  A.  Just primarily talked about the different places where he

1  stayed during the course of the period that he was fleeing

2  from authorities.  Primarily a couple stops in, in Utah at his

3  brother's home, and then his brother's brother-in-law's home

4  also in Utah, that he had stayed at his daughter's home on the

5  reservation close to Riverton in Wyoming, and also a trip to

6  Fort Riley in Kansas where he stayed with another daughter in

7  Kansas.  Those were the four places he had mentioned that, to

8  me anyway, that he had stayed during his time away.

9  Q.  All right.  And why was he, why was he staying in those

10  places?

11  A.  I think those were family members, and he just felt that

12  the search for him was unjustified and that he had, you know,

13  he had followed the protocol that had been taught to him in

14  California and in Nevada, in Las Vegas, and that, you know, it

15  didn't work out that way, and he was not about to submit to

16  the government's will and turn himself in.

17  Q.  All right.  Did -- you have a pretty good memory of this.

18  Did you take any notes?

19  A.  I did, I did, after the fact and just prior to the time

20  where I knew I was going to speak to the, to the FBI about the

21  case.

22  Q.  And did you, in fact, speak to the FBI?

23  A.  I did, yes.

24  Q.  Who did you speak to, if you remember?

25  A.  Mr. Kent Smith.

1  Q.  And did you relate to him the information you've related

2  to the jury?

3  A.  Yes.

4  Q.  As a result of your cooperation, have you had any issues

5  in the jail?

6  A.  Yes.  Uh, yeah.  When I checked in last Tuesday, the

7  inmates seemed to know, uh, you know, why I was there, so --

8  um, initially I was assaulted last year, in the same jail,

9  from behind and lost a tooth in that altercation.  In this

10  case it was just, uh -- you know, you're not looked kindly

11  upon if you're going to provide testimony to the United States

12  from jail about another inmate, so in this case they asked

13  that I go and press the button, it's called, leaving the pod

14  or, or, um -- there's a terminology for it.  I draw a blank on

15  what it's called when you -- when you're kicked out of the pod

16  basically through the threat of violence.  And so in this case

17  a couple inmates, three, came to the room, and although I, you

18  know, felt fairly confident, you know, I have small children

19  and looking to, you know, not get beat up, so I elected to go

20  ahead and press the button and tell the correctional officers

21  that, that I'd been threatened and I needed to go to a

22  different area, a different, a different pod area.

23  Q.  But there's been no threats by Mr. Iverson?

24  A.  Absolutely not, no.  No, certainly not.

25  Q.  In fact, would you say that you were friends with him at

1  the time that you were roomed with him?

2  A.  I think very much of him, yes.

3  Q.  Do you see Mr. Iverson in the courtroom?

4  A.  Yes, I do.

5  Q.  Could you please point him out by where he's sitting and

6  what he's wearing?

7  A.  Directly across, and he's wearing a nice suit.

8          MS. SPRECHER:  Thank you.  I have no further

9  questions.

10     (The defendant and standby counsel consult.)

11         THE COURT:  This would be a good time to take our

12  midmorning recess.  We'll stand in recess for 15 minutes.

13     (Proceedings recessed 10:23 a.m. to 10:43 a.m.,

14        resuming outside the presence of the jury.).)

15         THE COURT:  Let's bring the jury in.

16     (Jury in at 10:44 a.m.)

17         THE COURT:  Thank you, ladies and gentlemen.  Please

18  be seated.

19         Ladies and gentlemen, in addition to the other checks

20  that I have referred to, you have heard evidence of other acts

21  engaged in by the defendant.  You may consider that evidence

22  only as it bears on the defendant's intent, plan, knowledge,

23  absence of mistake, and for no other purpose.  Of course, the

24  fact that the defendant may have previously committed an act

25  similar to the one charged in this case does not mean that the

1   defendant necessarily committed the act charged in this case.

2          Do you wish to cross-examine?

3          MR. IVERSON:  I do.

4          THE COURT:  Very well.

5          COURTROOM DEPUTY:  Is his mike on?

6          MR. IVERSON:  Can you hear me on it?

7          THE REPORTER:  Just switch it on if we're using it.

8   Thank you.

9                     CROSS-EXAMINATION

10  BY MR. IVERSON:

11  Q.  Well, didn't expect to see you like this, but that's okay.

12         When I talked to you about what I had been doing, I

13  talked to you only about things that were legal; isn't that

14  right?

15  A.  Uh --

16  Q.  Or that I believed were legal?

17         THE COURT:  I don't think he can give legal opinions

18  in his testimony as to what is or isn't legal.

19         MR. IVERSON:  Okay.

20         THE COURT:  You might rephrase your question.

21  BY MR. IVERSON:

22  Q.  I wasn't trying to encourage you to do something wrong,

23  was I?

24  A.  No, sir, you were not.

25  Q.  Um, did I ever lead you to believe that I was defrauding

1    anyone?

2    A.   Just your comments that you had gone to training to learn

3    a scheme with regard to the EFTs.

4    Q.   And you, you felt like what I was talking about was a

5    scheme, not, not simply knowledge of the way some things can

6    work or the way they work?

7    A.   I solely used your, your term.  I made no interpretation

8    one way or the other.

9    Q.   Okay.  Now, you've talked about my going to California,

10   but I don't believe I ever did.  And, and then my -- you know,

11   most of what I -- the training that I had was in, in Nevada,

12   where I did go there.

13          MS. SPRECHER:  I'm going to object to the form of the

14   question.

15          THE COURT:  Sustained.

16          MR. IVERSON:  In the form of a question.

17          THE COURT:  I think you're making statements rather

18   than questioning the witness.

19   BY MR. IVERSON:

20   Q.   So are you aware that it was only Nevada?

21   A.   No, sir, I'm not aware of that.

22   Q.   I was wondering why you thought I was in California.

23   A.   That is just during the course of the time we were

24   together you had mentioned you'd gone to California for

25   additional training.


Julie H. Thomas, RMR, CRR                        (307)778-0078

1    Q.  Something I don't recall.  Okay.

2            When I was in Nevada, there was probably as many as

3    700 people at one time that were being trained to do the same

4    thing I'm doing or was doing.

5            MS. SPRECHER:  Objection to the form of the question,

6    Your Honor.

7            THE COURT:  Sustained.  You might ask him:  Did I

8    tell you how many people went to Nevada?

9            MR. IVERSON:  Did I what?

10   BY MR. IVERSON:

11   Q.  Did I tell you how many people were doing it there?

12   A.  No, sir, you did not.

13   Q.  Evidently you thought I had -- or you had a lot of

14   information for them to use against me or you wouldn't have

15   been doing this.  Is that right?

16   A.  I was subpoenaed to be here, Mr. Iverson.

17   Q.  Now, I'm not familiar with that process.  Is that -- I

18   mean, subpoena, yes, but somebody had to initiate talking

19   about it.  Did you initiate it?

20   A.  Yes, sir.

21   Q.  Then you ought to be able to answer that question.  Isn't

22   that true?

23   A.  Could you repeat the question?

24   Q.  That you felt like you had a lot of information that could

25   hurt me.

1   A.  I provided information to the FBI based solely on what you

2   told me.

3   Q.  Almost sounds like a different, uh, different story than

4   what I heard or what I recall.

5           MS. SPRECHER:  Objection, Your Honor.  It's

6   argumentative.

7           THE COURT:  It is.

8           MR. IVERSON:  It's argumentative.

9           THE COURT:  The statement is stricken.

10          MR. IVERSON:  Well, I guess that's about all I have.

11          MS. SPRECHER:  I don't have any other questions.

12  Thank you.

13          THE COURT:  Very well.  Mr. Cardwell, you are

14  excused.

15          THE WITNESS:  Thank you.

16                  *     *     *     *     *

17      (Proceedings recessed 5:04 p.m.,

18      July 29, 2014.)

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3

4              I, JULIE H. THOMAS, Official Court Reporter for the

5    United States District Court for the District of Wyoming, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein on the aforementioned subject on

9    the date herein set forth, and that the foregoing pages

10   constitute a full, true and correct transcript.

11              Dated this 22nd day of December, 2014.

12

13

14

15                        /s/ Julie H. Thomas

16                       JULIE H. THOMAS
                        Official Court Reporter
17                      Registered Merit Reporter
                       Certified Realtime Reporter
18                        CA CSR No.  9162

19

20

21

22

23

24

25